8          IN THE UNITED STATES DISTRICT COURT

9          FOR THE EASTERN DISTRICT OF CALIFORNIA

10   STEVEN ANTHONY GUZMAN,

11          Petitioner,                    No. CIV S-04-0700 FCD GGH P

12      vs.

13   A. LAMARQUE, Warden,              FINDINGS AND RECOMMENDATIONS

14          Respondent.

15   _____/

16          Petitioner is a state prisoner with appointed counsel who is proceeding on a

17   second amended petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.[1]  In 2000, in

18   Sacramento County Superior Court, petitioner was sentenced to a total term of 31 years to life, 25

19   years for manslaughter, with two prior strike convictions, five years for the prior serious felony

20   conviction, a one-year enhancement for personal use of a deadly weapon, a knife.  Second

21   Amended Petition (hereafter, petition or ptn), p. 2.   Petitioner sets forth the following claims,

22   with claim 4 expressly abandoned: 1) petitioner's state and federal rights to due process were

23   violated when he was found sane on less than substantial evidence and because California's

24   _____

25      [1] This matter, filed on April 7, 2004,  was stayed from October 27, 2004, until December
     22, 2005, pending exhaustion of state court remedies as to petitioner's claim of a due process
26   violation in the imposition of sentence.  See Orders, filed on 10/27/04 (docket # 13), and on
     12/22/05 (# 15).

1 definition of insanity of itself violates due process of law; 2) his right to due process was violated

2 when the court acted arbitrarily and disregarded established state standards in denying

3 petitioner's motion to dismiss one or more strike convictions; 3) his state and federal rights to

4 due process were violated when the court imposed a 31-year-to-life sentence; 4) trial judge was

5 not impartial (abandoned); 5) ineffective assistance of trial counsel. Petition, pp. 5-21.

6 Anti-Terrorism and Effective Death Penalty Act (AEDPA)

7       The AEDPA "worked substantial changes to the law of habeas corpus,"

8 establishing more deferential standards of review to be used by a federal habeas court in

9 assessing a state court's adjudication of a criminal defendant's claims of constitutional error.

10 Moore v. Calderon, 108 F.3d 261, 263 (9th Cir. 1997).

11       In Williams (Terry) v. Taylor, 529 U.S. 362, 120 S. Ct. 1495 (2000), the Supreme

12 Court defined the operative review standard set forth in § 2254(d). Justice O'Connor's opinion

13 for Section II of the opinion constitutes the majority opinion of the court. There is a dichotomy

14 between "contrary to" clearly established law as enunciated by the Supreme Court, and an

15 "unreasonable application of" that law. Id. at 1519. "Contrary to" clearly established law applies

16 to two situations: (1) where the state court legal conclusion is opposite that of the Supreme

17 Court on a point of law, or (2) if the state court case is materially indistinguishable from a

18 Supreme Court case, i.e., on point factually, yet the legal result is opposite.

19       "Unreasonable application" of established law, on the other hand, applies to

20 mixed questions of law and fact, that is, the application of law to fact where there are no factually

21 on point Supreme Court cases which mandate the result for the precise factual scenario at issue.

22 Williams (Terry), 529 U.S. at 407-08, 120 S. Ct. at 1520-1521 (2000). It is this prong of the

23 AEDPA standard of review which directs deference to be paid to state court decisions. While the

24 deference is not blindly automatic, "the most important point is that an *unreasonable* application

25 of federal law is different from an incorrect application of law....[A] federal habeas court may not

26 issue the writ simply because that court concludes in its independent judgment that the relevant

state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Williams (Terry), 529 U.S. at 410-11, 120 S. Ct. at 1522 (emphasis in original). The habeas corpus petitioner bears the burden of demonstrating the objectively unreasonable nature of the state court decision in light of controlling Supreme Court authority. Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002).

The state courts need not have cited to federal authority, or even have indicated awareness of federal authority in arriving at their decision. Early v. Packer, 537 U.S. 3, 123 S. Ct. 362 (2002). Nevertheless, the state decision cannot be rejected unless the decision itself is contrary to, or an unreasonable application of, established Supreme Court authority. Id. An unreasonable error is one in excess of even a reviewing court's perception that "clear error" has occurred. Lockyer v. Andrade, 538 U.S. 63, 75-76, 123 S. Ct. 1166, 1175 (2003). Moreover, the established Supreme Court authority reviewed must be a pronouncement on constitutional principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules binding only on federal courts. Early v. Packer, 537 U.S. at 9, 123 S. Ct. at 366.

However, where the state courts have not addressed the constitutional issue in dispute in any reasoned opinion, the federal court will independently review the record in adjudication of that issue. "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

The California Court of Appeal was the last state court to issue a reasoned opinion addressing most[2] of the claims raised in this action. See Respondent's Lodged Documents 4 & 6 & below. Accordingly, this court considers whether the denial of this claim by the California Court of Appeal was an unreasonable application of clearly established Supreme Court authority.

---

[2] Portions of claims 1 and 5 were not addressed therein (see below).

Shackleford v. Hubbard, 234 F.3d 1072, 1079 n. 2 (9th Cir. 2000) (when reviewing a state court's summary denial of a claim, the court "looks through" the summary disposition to the last reasoned decision).

Procedural Background

The opinion of the California Court of Appeal contains an accurate procedural summary of the case on appeal to that court:

> Defendant Steven Anthony Guzman was charged with murdering his wife by using a knife. (Pen.Code, §§ 187, subd. (a), 12022, subd. (b)(1).) FN1 After an initial doubt was declared as to his mental status, the trial court found him competent to stand trial. (§ 1368.) Defendant entered a negotiated guilty plea to voluntary manslaughter, with use of a knife, and waived a jury trial on the issues of his sanity and the truth of the two prior serious felony convictions. The trial court found defendant sane and found the priors to be true. Defendant was sentenced to 31 years to life in prison.
>
> > FN1. All further statutory references are to the Penal Code unless otherwise indicated.

People v. Guzman, 2002 WL 1801768 *1 (Cal. App. 3rd Dist. 2002).[3]

Factual Background

After independently reviewing the record, the court finds the factual summary of this case to be accurate and adopts it below:

> On May 18, 1999, suffering from a delusion that his wife was engaged in a plot to murder him, defendant killed his wife by stabbing her four times in the back with a kitchen knife.
>
> Defendant began experiencing paranoid delusions in November 1998, after being stabbed in the face and hit on the head with bottles. He became addicted to methamphetamine. Defendant believed the FBI and CIA were out to kill him, and that his wife, then his girlfriend, was involved in the conspiracy. On four occasions, defendant went to the victim's advocate office at the district attorney's office because he was afraid he was going to be killed. On March 3, 1999, one advocate had an investigator assist defendant to the psychiatric unit at the UC Davis Medical Center.

---

[3] See also, respondent's Lodged Document 3, a copy of the August 6, 2002, People v. Guzman unpublished Third District Court of Appeal decision.

Defendant moved to Reno for a few weeks to escape from the people who were trying to kill him. A Reno psychiatric center determined defendant was paranoid, but he was not involuntarily committed.

Defendant married the victim on April 26, 1999, three weeks before the stabbing.

At 1:00 p.m. on the day of the homicide, defendant went to the UC Davis Medical Center emergency room with a hamburger his wife bought for him the night before. Defendant believed his wife, the fast food restaurant, and the government were plotting to kill him. He wanted the hamburger tested for poison, so he could go to the police and have the people stopped who were trying to kill him. Clinical social worker Kevin Gutfeld evaluated defendant and found him to be classically paranoid and very anxious. Defendant told Gutfeld he believed his wife and the government were after him. Gutfeld did not believe defendant to be suicidal or homicidal, although he did believe defendant should be hospitalized. When Gutfeld was unable to walk defendant across the street to the county psychiatric center, defendant asked to stay in the waiting room of the emergency room.

Defendant called his wife to pick him up, but she told him to take a cab to the apartment. When he entered the apartment, he saw his wife using the computer and believed her to be communicating with "agents." He saw a knife on the table next to the desk. He picked up the knife and stabbed her in the upper back because he believed she would kill him. When she asked him why he was stabbing her, he thought that maybe she was not involved in the plot to kill him because she did not understand the reason he was stabbing her.

*2 Defendant called 911. He attempted to flag down a delivery driver. He ran to his father's house, who would not help him. He went to his mother's home and attempted to contact the police. He then went to the county psychiatric center and turned himself in. He was arrested that night.

After administration of antipsychotic medication for several days, defendant was released to the general jail population. Defendant's delusions reoccurred. Defendant was placed on Navane, an antipsychotic medication. Some months later, defendant again decompensated into paranoid ideation, after being off medication, believing that the jail workers were connected with FBI agents, who were giving him AIDS through blood tests. He was again placed on Navane.

On June 25, 1999, defense counsel declared a doubt as to defendant's competency to stand trial and two alienists-Dr. Bruce W. Ebert and Dr. John Alan Foster-were appointed to evaluate

him. (§§ 1367-1368.) FN3 Defendant was found competent to stand trial on August 25, 1999.

> FN3. Although both found defendant to be competent, both also thought he was disturbed. Dr. Ebert believed defendant's disorder might be based on organic problems, inasmuch as his mother and brother had brain tumors and his family members all had significant mental problems. Dr. Ebert surmised defendant suffered from a methamphetamine induced psychotic disorder with delusions, but did not rule out a delusional disorder.

It was stipulated by the parties that the trial court could review a number of documents as exhibits before trial, including police and coroner reports, photographs, competency evaluations, and sanity evaluations.

At trial, defendant was still taking Navane. Defendant testified that he did not know for sure whether his wife had been trying to kill him, but was "pretty sure" other people had been trying to kill him.

Three appointed alienists, Dr. Daniel Edwards, Dr. Eugene Roeder, and Dr. Michael Jaffe testified at the sanity trial.

Dr. Edwards, a neuropsychologist called by the defense, met with defendant four times and administered a variety of tests. On June 9, 1999, Dr. Edwards found defendant "too psychotic" to cooperate in a clinical interview. In December 1999, Dr. Edwards found defendant to be suffering from a delusional disorder that distorted his ability to know stabbing his wife was wrong. Dr. Edwards concluded defendant met the criteria for not guilty by reason of insanity. Dr. Edwards further concluded that, at the time of the stabbing, defendant was unable to understand the nature and quality of his acts and did not know it was wrong to stab his wife until she asked him why he had stabbed her.

Dr. Roeder, a psychologist called as a prosecution witness, found defendant to be suffering from a psychotic disorder that was most likely induced by methamphetamine. After one interview, Dr. Roeder concluded defendant understood the nature and quality of his act of stabbing his wife in a limited way, but believed stabbing his wife was right because he was defending himself.

Dr. Jaffe, a prosecution witness, is chief psychiatrist at California State Prison, Sacramento. He diagnosed defendant as suffering from a drug-induced psychotic disorder with delusions. Dr. Jaffe concluded defendant understood the nature and quality of his act when he stabbed his wife and further concluded defendant knew it was wrong to stab his wife before, during, and after he killed her.

*3 The trial court found defendant to have been sane at the time he killed his wife. The trial court concluded defendant did understand the nature and quality of his acts. While conceding that the question of whether defendant knew the stabbing was wrong was a much closer question, the trial court concluded defendant morally and legally understood right and wrong at the time of the killing. The trial court did find defendant suffered from a delusion that his wife was going to kill him and that he suffered from heightened fear. However, the trial court found that there was not a preponderance of the evidence that defendant's state of mind was that he was morally and legally justified to act in self-defense.

The trial court found two 1989 prior serious felony convictions to be true. (§§ 667, subd. (a), 667, subd. (b)-(I).) One prior robbery conviction (§ 211) was found true, as was a second conviction of brandishing a firearm at a police officer (§ 417, subd .(b)). The trial court determined the brandishing charge was a serious felony under section 1192.7, subdivision (c)(8), because defendant personally used a firearm in the offense.

The trial court denied defendant's request to strike one of the prior felony convictions. The trial court found that although both prior convictions arose in the same case from the same date of commission, they involved separate threats of violence. Defendant also had a history of criminal conduct between the commission of the offenses and the current offense. The trial court also found that the taking of a life in the current offense made it inappropriate to treat defendant as outside the spirit of the three strikes law. However, the trial court declined to impose the five-year enhancement for the second prior conviction "in the interest of justice." Defendant was sentenced to 31 years to life in prison.

<u>People v. Guzman</u>, 2002 WL 1801768 *1-3 (Cal. App. 3rd Dist. 2002).[4]

<u>Claim 1</u>  <u>State and Federal Due Process violations when petitioner found sane on less than substantial evidence and because California's definition of insanity itself violates Due Process</u>

Petitioner cites no case law for the argument that the trial court's finding of sanity violated petitioner's Fourteenth Amendment rights or that California law, requiring proof by the petitioner of the insanity defense by a preponderance of the evidence that not only could he not know the nature and quality of the crime of which he is accused, but also that he could not distinguish right from wrong at the time of the act due to his mental illness, violates due process.

---

[4] <u>See also</u>, respondent's Lodged Document 3, a copy of the August 6, 2002, <u>People v. Guzman</u> unpublished Third District Court of Appeal decision.

Ptn, p. 6.  Petitioner asserts that the federal constitution requires that states permit an individual to claim that, due to a mental defect, one could not know the nature and quality of the crime of which one is accused, although, again, no case authority is cited for that proposition.  Id.

Petitioner does set forth exhaustively the factual predicate for the claim that "substantial evidence" did not support the trial court's finding of sanity.  Ptn, pp. 5-15.  Petitioner is correct that there is ample evidence in the record demonstrating that petitioner stabbed his wife during a psychotic episode, nor does respondent dispute that petitioner suffered from a delusion that his wife was engaged in a conspiracy to murder him at the time that he killed her.  Petitioner identifies the inception of his mental health problems as stemming from a November, 1998, bar fight, wherein petitioner was stabbed in the face, requiring numerous stitches, and was hit on the head with bottles; there is no doubt, as well, that petitioner was diagnosed as having a delusional disorder, complicated by "chronic methamphetamine intoxication."  Ptn, pp. 5-6.  The record showed that petitioner had on four occasions asked for help from the District Attorney's Victims' Advocates office, and that, on March 3, 1999, the victim advocates were sufficiently concerned by petitioner's actions to have one of their investigators make sure that he got to a medical center (U.C. Davis Medical Center).  RT 123, 126-130.  On May 18, 1999, the date of the offense, Kevin Gutfeld, a UCD Medical Center clinical social worker, testified petitioner brought a hamburger to the UCD Medical Center emergency around 1 p.m., asking that it be tested for poison, saying that his wife had bought it, and voicing his suspicion that she and the fast food chain and the government were all trying to kill him; Gutfeld described petitioner at that time as "classically paranoid," "very anxious, very tense," but based on his responses ruled out that petitioner was suicidal or homicidal.  RT 23-30.  He found him to be in a lot of "intrapsychic or emotional pain;" although Gutfeld did not feel petitioner was sufficiently a danger to himself or others to place a hold on him, he tried to get petitioner to voluntarily proceed to the Sacramento County Mental Health Center.  RT 30-34.  Instead, a while later, petitioner returned to the UCD Med Center emergency room waiting area, and then went home, whereupon he ended by stabbing

8

his wife in the deluded belief that she was about to kill him.

As noted in the state appellate court opinion below, all three medical experts who testified on the issue of petitioner's mental state, one for the defense (Dr. Edwards) and two for the prosecution (Drs. Roeder and Jaffe), described petitioner as suffering from a "delusional disorder and killed his wife in the unreasonable belief that it was necessary to do so in order to protect himself." Ptn, at 6. The only trial issue was whether petitioner was legally insane at the time of the killing. Id.

The Third District Court of Appeal provided the following analysis as to this claim:

> Defendant argues that substantial evidence does not support the trial court's finding he was sane at the time of the commission of the offense. We disagree.
>
> Commonly referred to as the " *M'Naghten* test," FN4 the California statutory standard for insanity is:
>
>> FN4. *M'Naghten's Case* (1843) 10 Clark & Fin. 200, 210 [8 Eng. Rep. 718, 722].
>
> "In any criminal proceeding, including any juvenile court proceeding, in which a plea of not guilty by reason of insanity is entered, this defense shall be found by the trier of fact only when the accused person proves by a preponderance of the evidence that he or she was incapable of knowing or understanding the nature and quality of his or her act and of distinguishing right from wrong at the time of the commission of the offense." (Pen.Code, § 25, subd. (b).)
>
> In *People v. Skinner* (1985) 39 Cal.3d 765, 773-775, 217 Cal.Rptr. 685, 704 P.2d 752, the Supreme Court held that, despite the statutory use of "and", the two prongs of the traditional standard should be separated by an "or." This disjunctive use of the *M'Naghten* standard stands *"among the fundamental principles of our criminal law." ( Id*. at p. 776, 217 Cal.Rptr. 685, 704 P.2d 752; *People v. McCowan* (1986) 182 Cal.App.3d 1, 17, 227 Cal.Rptr. 23.)
>
> *4 We determine whether there was substantial evidence to support the verdict of sanity under general appellate principles governing sufficiency of evidence. The question is whether any rational trier of fact could have made this finding, based on evidence which is reasonable, credible, and of solid value. (See *People v. Alvarez*

(1996) 14 Cal.4th 155, 224, 58 Cal.Rptr.2d 385, 926 P.2d 365; *People v. Johnson* (1980) 26 Cal.3d 557, 575-576, 162 Cal.Rptr. 431, 606 P.2d 738.) This announced rule of appellate review does not change if the issue is one of insanity. As was stated in *People v. Dean* (1958) 158 Cal.App.2d 572, 577, 322 P.2d 929: "The finding of the trier of fact upon the issue of insanity cannot be disturbed on appeal if there is any substantial and credible evidence in the record to support such finding." The question in the case before us is whether there is any reasonable hypothesis upon which the trial judge could have found the defendant legally sane during the commission of the crime. ( *People v. Belcher* (1969) 269 Cal.App.2d 215, 220, 74 Cal.Rptr. 602.) As used in the sanity test, knowing right from "wrong" is not limited to that which is legally wrong, but includes that which is morally wrong in a sense generally accepted by society. ( *People v. Coddington* (2000) 23 Cal.4th 529, 608-609, 97 Cal.Rptr.2d 528, 2 P.3d 1081; *People v. Skinner*, *supra*, 39 Cal.3d at p. 783, 217 Cal.Rptr. 685, 704 P.2d 752.) A person who, by reason of mental disease or mental defect, is incapable of distinguishing what is morally right from what is morally wrong is legally insane, even if he may understand the act is unlawful. ( *People v. Coddington*, *supra*, at p. 608, 97 Cal.Rptr.2d 528, 2 P.3d 1081.) But, if a person is able to understand his action is legally wrong, this may permit the trier of fact to infer that he also knew it was morally wrong. (*Ibid.*)

Presuming in support of the judgment the existence of every fact that the trier of fact could reasonably deduce from the evidence, we find the trial court's decision was supported by substantial evidence. In making this determination, we recognize that all conflicts are to be resolved in favor of the prevailing party and that issues of fact and credibility are questions for the trier of fact. ( *People v. Mercer* (1999) 70 Cal.App.4th 463, 467, 82 Cal.Rptr.2d 723.) The reviewing court may not reweigh the evidence when assessing its sufficiency. ( *People v. Johnson*, *supra*, 26 Cal.3d at p. 578, 162 Cal.Rptr. 431, 606 P.2d 738.)

Three experts testified at trial. It was undisputed that defendant suffered from a delusional disorder, variously described as a "drug-induced psychotic disorder with delusions" by Dr. Jaffe, a methamphetamine-induced psychotic disorder by Dr. Roeder, and a delusional disorder that might or might not be amphetamine-induced psychosis, by Dr. Edwards. It was virtually undisputed that defendant somewhat understood the nature and quality of his act in stabbing his wife. The close question was whether he knew right from wrong at that time. Although the experts disagreed, with only Dr. Jaffe opining that defendant clearly knew right from wrong, it is the relative force of the evidence rather than the number of witnesses, that must persuade the trier of fact.

*5 Dr. Jaffe opined that defendant knew right from wrong the

"whole time," and particularly when he stabbed his wife. Dr. Jaffe's opinion was that although defendant actually believed he needed to use the knife to protect himself, his opinion was based upon defendant's own statements to him that he had "overreacted" and "fucked up," in addition to the circumstances of the homicide. The trial court also observed defendant's own testimony that he knew the stabbing was wrong immediately after his wife asked why he did it, but not immediately before.

The trial court was presented with the fine question concerning when defendant was "in reality" and unaware of the wrongfulness of his acts. The trial court found that although defendant's mental disorders caused him to be in fear of his wife, the fear was not so great as to erase his understanding that what he was doing was wrong. The court stated that the evidence supported a finding that defendant believed he knew it was morally and legally wrong to stab his wife.

Additional facts in the record noted by the trial court supported its finding of sanity. Defendant admitted to Dr. Jaffe, for example, that the presence of the knife in the middle of the afternoon, in and of itself, was not unusual because his wife used the knife to open the mail. Defendant's paranoia did not cause him to flee from his wife, as he had earlier fled the area when he was afraid. He contacted her to pick him up. Finally, it was also unclear exactly when the victim asked defendant why he was stabbing her-at the conclusion of the attack or during the attack. Dr. Jaffe opined that people do not "flip-flop" back and forth from reality to delusion.

Therefore, we conclude the trial court's finding of sanity is supported by substantial evidence.

Guzman, supra, at *3-5.

Whether California's Insanity Test is Unconstitutional

Petitioner must be simply preserving this issue for the record because there is no

established Supreme Court authority finding the M'Naghten test unconstitutional, or that tasking

the defendant with proving insanity is unconstitutional.

The Supreme Court has found state statutory schemes which burden the defendant

with proving insanity do not violate the Fourteenth Amendment's due process guarantee. Leland

v. State of Oregon, 343 U.S. 790, 72 S. Ct. 1002 (1952) (upholding Oregon statute requiring

defendant to prove insanity beyond a reasonable doubt, once commission of crime has been

proven). In Patterson v. New York, 432 U.S. 197, 205, 97 S. Ct. 2319 (1977), the Supreme

1   Court noted that post-<u>In re Winship</u>, 397 U.S. 358, 364, 90 S. Ct. 1068, 1073 (1970)[5] and

2   <u>Mullaney v. Wilbur</u>, 421 U.S. 648, 95 S. Ct. 1881 (1975),[6] it had "confirmed that it remained

3   constitutional to burden the defendant with proving his insanity defense" in dismissing a

4   challenge to the "continuing validity of <u>Leland v. Oregon</u>," citing <u>Rivera v. Delaware</u>, 429 U.S.

5   877, 97 S. Ct. 226 (1976), "as not presenting a substantial federal question."

6           [A]lthough an insanity defense may be relevant to the element of
            mens rea, FN5 "sanity is not an element of the crime" under
7           California law, even when the defendant pleads not guilty by
            reason of insanity.  See *[People v.] Hernandez*, 22 Cal.4th at 522,
8           93 Cal.Rptr.2d 509, 994 P.2d 354 (noting that the affirmative
            defense of insanity is separate and independent from the elements
9           of any underlying crime); see also *People v. Wagoner*, 89
            Cal.App.3d 605, 613, 152 Cal.Rptr. 639 (1979) (citation omitted).

10
            FN5. As then-Justice Rehnquist has observed,
11          "[a]lthough ... evidence relevant to insanity as
            defined by state law may also be relevant to whether
12          the required mens rea was present, the existence or
            nonexistence of legal insanity bears no necessary
13          relationship to the existence or nonexistence of the
            required mental elements of the crime." *Mullaney v.*
14          *Wilbur*, 421 U.S. 684, 705-06, 95 S. Ct. 1881, 44
            L.Ed.2d 508 (1975) (concurring opinion).

15

16  <u>Pop v. Yarborough</u>, 354 F. Supp.2d at 1137.

17          Moreover, although the United States Supreme Court has long recognized that

18  "the Due Process Clause affords an incompetent defendant the right not to be tried, [citations

19  omitted], we have not said that the Constitution requires the States to recognize the insanity

20  defense.  See, e.g., <u>Powell v. Texas</u>, 392 U.S. 514, 536-537, 88 S. Ct. 2145, 2156-2157, 20

21  L.Ed.2d 1254 (1968)."  <u>Medina v. California</u>, 505 U.S. 437, 449, 112 S. Ct. 2572, 2579 (1992).

22

23          [5] Declaring that due process requires an accused may not be convicted "except upon proof
    beyond a reasonable doubt of every fact necessary to constitute the crime with which he is
24  charged."

25          [6] Wherein the Supreme Court held that Maine's law requiring a defendant charged with
    homicide to prove a killing "in the heat of passion on sudden provocation" by a preponderance of
26  the evidence to reduce the charge to manslaughter was unconstitutional.

Nor, as respondent notes, does a state's application of the M'Naughten rule[7] violate the constitution. Answer, p. 16, citing Hunt v. Eyman, 405 F.2d 384, 385 (9th Cir. 1968). Although conceding state court exhaustion as to the first portion of this claim, respondent nevertheless asserts that part of the claim setting forth that California's definition of insanity violates due process is not exhausted. Answer, p. 9 & n. 3, citing 28 U.S.C. § 2254(b). Petitioner does not dispute that this portion of the first claim is unexhausted. Respondent, contending there is no merit to such a claim, asks the court to reach the argument on the merits notwithstanding a failure to exhaust state remedies because the court can dispose of such claims. Answer, p. 16, citing Gutierrez v. Griggs, 695 F.2d 1195, 1198 (9th Cir. 1983) (petition which lacks merit may be dismissed without resolving the question of lack of exhaustion). Plainly, as the Supreme Court has never found that the constitution requires the states to recognize an insanity defense,[8] California's statute cannot run afoul of the Fourteenth Amendment; moreover, the Supreme Court has most recently emphasized that "it is not 'an unreasonable application of clearly established Federal law' for a state court to decline to apply a specific legal rule that has not been squarely established by this Court." Knowles v. Mirzayance, __ S. Ct. __, 2009 WL 746274 *2 (Mar 24, 2009), citing Wright v. Van Patten, 552 U.S.___, ___, 128 S. Ct. 743 (2008).[9] This

[7] "[T]o establish a defence on the ground of insanity, it must be clearly proved that, at the time of the committing the act, the party accused was labouring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing; *or*, if he did know it, that he did not know he was doing what was wrong." People v. Skinner, 39 Cal.3d 765, 217 Cal.Rptr. 685 (Cal. 1985), quoting M'Naughten's Case, 10 Clark & Fin. 2100, 210 [8 Eng. Rep. 718, 722 (1843) (italics added in Skinner).

[8] See, also, Moore v. Duckworth, 443 U.S. 713, 99 S. Ct. 3088 (1979) where state law permits sanity to be established either by expert or lay witness testimony, evidence of murder defendant's sanity at time of killing constitutionally adequate even where prosecution relied on lay testimony and did not rebut defendant's expert testimony with expert testimony, citing Jackson, infra, standard.

[9] In Van Patten, supra, 128 S. Ct. at 747, the Supreme Court noted that its cases had given "no clear answer to the question presented," thus, it could not "be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law,'" citing Carey v. Musladin, 549 U.S. 70, [77], 127 S. Ct. 649, 654 (2006) (finding the "lack of holdings" from the Supreme Court with regard to the issue germane to that case to mean that the state court's ruling could not be said to

1  portion of the first claim should be denied.

2  Insufficient Evidence

3  *Legal Standard*

4  Generally, when a challenge is brought alleging insufficient evidence, federal

5  habeas corpus relief is available if it is found that upon the record evidence adduced at trial,

6  viewed in the light most favorable to the prosecution, no rational trier of fact could have found

7  "the essential elements of the crime" proven beyond a reasonable doubt.  Jackson v. Virginia,

8  443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979).  Under Jackson, the court reviews the entire

9  record when the sufficiency of the evidence is challenged on habeas.  Adamson v. Ricketts, 758

10  F.2d 441, 448 n. 11 (9th Cir. 1985), vacated on other grounds, 789 F.2d 722 (9th Cir. 1986) (en

11  banc), rev'd, 483 U.S. 1 (1987).  It is the province of the jury to "resolve conflicts in the

12  testimony, to weigh the evidence, and to draw reasonable inferences from basic facts." Jackson,

13  443 U.S. at 319, 99 S. Ct. at 2789.  "The question is not whether we are personally convinced

14  beyond a reasonable doubt.  It is whether rational jurors could have reached the same conclusion

15  that these jurors reached." Roehler v. Borg, 945 F.2d 303, 306 (9th Cir. 1991).

16  If the trier of fact could draw conflicting inferences from the evidence, the court in

17  its review will assign the inference that favors conviction.  McMillan v. Gomez, 19 F.3d 465,

18  469 (9th Cir. 1994).  The fact that petitioner can construct from the evidence alternative scenarios

19  at odds with the verdict does not mean that the evidence was insufficient, i.e., that no reasonable

20  trier of fact could have found the conviction scenario beyond a reasonable doubt.

21  In reviewing the sufficiency of the evidence supporting a
   conviction, we search the record to determine "whether a
22  reasonable jury, after viewing the evidence in the light most
   favorable to the government, could have found the defendants
23  guilty beyond a reasonable doubt of each essential element of the
   crime charged." United States v. Douglass, 780 F.2d 1472, 1476
24  (9th Cir.1986).  *The relevant inquiry is not whether the evidence
   excludes every hypothesis except guilt, but whether the jury could*
25

26  be an unreasonable application of clearly established federal law).

1    *reasonably arrive at its verdict.* United States v. Fleishman, 684
     F.2d 1329, 1340 (9th Cir.), cert. denied, 459 U.S. 1044, 103 S. Ct.
2    464, 74 L. Ed.2d 614 (1982); United States v. Federico, 658 F.2d
     1337, 1343 (9th Cir.1981), overruled on other grounds, United
3    States v. De Bright, 730 F.2d 1255, 1259 (9th Cir.1984) (en banc).

4    United States v. Mares, 940 F.2d 455, 458 (9th Cir. 1991)(emphasis added).

5            Superimposed on these already stringent insufficiency standards is the AEDPA

6    requirement that even if a federal court were to initially find on its own that no reasonable jury

7    should have arrived at its conclusion, the federal court must also determine that the state

8    appellate court not have affirmed the verdict under the Jackson standard in the absence of an

9    unreasonable determination.  Juan H. v. Allen, 408 F.3d 1262 (9th Cir. 2005).

10           However, these traditional standards for reviewing sufficiency of the evidence do

11   not precisely fit the situation where the defendant, not the state, has the burden of proof, and that

12   burden is a preponderance of the evidence, and not beyond a reasonable doubt.

13           In California, insanity is an affirmative defense to a charged crime and at the

14   trial's sanity phase, "there is a rebuttable presumption the defendant was sane when the crime

15   was committed, and it is his burden to prove otherwise by a preponderance of the evidence."

16   Pop v. Yarborough, 354 F. Supp.2d 1132, 1137 (C.D. Cal. 2005), citing In re Dennis, 51 Cal.2d

17   666, 673, 335 P2d 657 (1959).   In the Fifth Circuit, where Louisiana law with regard to a legal

18   insanity defense, like that of California within this circuit, makes sanity a rebuttable presumption

19   by defendant to prove by a preponderance of the evidence, frames "the question under the

20   Jackson sufficiency standard" in this context as "whether, viewing the evidence in the light most

21   favorable to the state, any rational trier of fact could have found beyond a reasonable doubt that

22   [petitioner] did not prove by a preponderance of the evidence that he was insane at the time of

23   the offense." Perez v. Cain, 529 F.3d 588, 594 (5th Cir. 2008).  The Fifth Circuit did not explain

24   why the trial court's factual finding of sanity would not be treated the same as any other factual

25   finding short of a finding of guilt at trial.  On habeas review, the state court's factual findings are

26   afforded a presumption of correctness which presumption it is petitioner's burden to rebut "by

clear and convincing evidence." <u>Miller-El  v. Dretke</u>, 545 U.S. 231, 240, 125 S. Ct. 2317, 2325 (2005), citing 28 U.S.C. § 2254(e)(1); <u>Moses v. Payne</u>, 555F.3d 742, 746 n. 1 (9th Cir. 2009), § 2254 (e)(1) and <u>Hernandez v. Small</u>, 282 F.3d 1132, 1135 n. 1 (9th Cir. 2002).  In other  words, petitioner would bear the burden under this less stringent test to show that the trial court's determination was not based on substantial evidence.[10]

The undersigned need not find which standard of review is the one to be applied because under either one, the court cannot find that the trial court's non-insanity finding based on a preponderance of the evidence was incorrect beyond a reasonable doubt; nor can it find that the trial court's non-insanity finding was based on less than substantial evidence.

*Analysis*

This is not to say that another court may not have made the same determination; in particular, the court notes that the trial court placed great emphasis on Dr. Jaffe's determination that petitioner understood right and wrong when his wife was stabbed, but the record demonstrates some recognition of a lack of coherence on this point by Dr. Jaffe himself:

Q.  Do you believe Mr. Guzman was in reality during the time of the stabbing?

A.  I believe he was in reality the whole time.

Q.  Do you believe that he knew right from wrong at that time?

A.  My own personal opinion, yes, I think he knew right from wrong, because he was also very aware that she could harm him and knew that was wrong.

RT 165-166 (excerpt of Jaffe testimony on direct).

Q. But yet- - maybe I'm missing this, but you still respond to the question of, did he have the capacity to understand and consider the lawful rights of others, that he did not have this capacity - -

A.  Right.

---

[10] In this context, substantial evidence may be less than a preponderance, but more than a scintilla.

Q. - - as he was too distraught, too hysterical, too wrapped up in his own fears for his life.

A. Right, but that, to me, is a separate issue. It really was separate. I don't even know why the question was there, because that's a chronic thing that was going on with him. It wasn't an acute thing.

The incident was an acute episode, but that feeling was a chronic one. I don't even know why it was in the list.

Q. Well, it's there.

A. I know.

Q. And you answered it.

A. I knew after I answered it, it was going to be confusing.

RT 188 (excerpt of Jaffe testimony on re-cross-examination).

Petitioner focuses on Dr. Jaffe's having "ignored the pivotal question" as to when petitioner knew his act was "wrong." Ptn, p. 14. Since petitioner had consistently acknowledged that he knew what he had done was wrong immediately afterward, petitioner contends that even Dr. Jaffe's testimony did not show that petitioner knew right from wrong at the time of the offense. Id. at 15.[11] As well, Dr. Jaffe was adamant that delusions under the DSM IV must be "fixed, ingrained" to constitute a delusional disorder and that "[a] delusional disorder is unshakable" and "not amenable to treatment," which was roundly disputed by Dr. Edwards. RT 176-178, 193-196. Dr. Edwards testified that petitioner's delusional disorder was the "persecutory type," which the DSM IV characterizes as a subtype of delusional disorder:

> when the delusion involves the person's belief that he or she is being conspired against, cheated, spied on, followed, poisoned, or drugged, maliciously maligned, harassed, or obstructed in the pursuit of long-term goals. Small slights may be exaggerated and become the focus of a delusional system. The focus of the delusion is often on some injustice that must be remedied by legal action ("querulous paranoia"), and the affected person may engage in repeated attempts to obtain satisfaction by appeal to the courts and other government agencies. Individuals with persecutory

---

[11] Petitioner promises further facts from an ongoing investigation (as to this and each claim) which have failed to materialize. Id.

> delusions are often resentful and angry and may resort to violence
> against those they believe are hurting them.

American Psychiatric Association: *Diagnostic and Statistical Manual of Mental Disorders*,

Fourth Edition, Washington, DC, American Psychiatric Association, 1994 (DSM IV), p. 298.[12]

An individual with the persecutory type of delusional disorder has as "the predominant

delusional theme"... "delusions that the person (or someone to whom the person is close) is being

malevolently treated in some way." DSM-IV, p. 301. The DSM-IV characterizes the

persecutory type as "the most common subtype" of delusional disorder, stating in part:

> The course is quite variable. Especially in the Persecutory Type,
> the disorder may be chronic, although a waxing and waning of the
> preoccupation with the delusional belief often occurs. In other
> cases, full periods of remission may be followed by subsequent
> relapses. In yet other cases, the disorder remits within a few
> months, often without subsequent relapse.

Id., at 299; see also, RT 195.

On the other hand, while it is clear that Drs. Jaffe and Edwards do not agree as to

how fixed a delusion must be to constitute a genuine delusional disorder under the DSM IV or on

their interpretation of the DSM IV, it cannot be said simply because Dr. Jaffe was the only

psychiatrist who was definite that petitioner understood that he was wrong to stab his wife as he

was doing it, and that the trial court relied most on his testimony, that the state appellate court

was objectively unreasonable in finding that the trial court had substantial evidence to support

the finding of sanity.

\\\\\

---

[12] This court takes judicial notice of the DSM IV. Fed. R. Evid. 201(b) permits courts to take judicial notice of a fact "not subject to reasonable dispute" either because it is (1) generally known... or (2) "capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned." Rule 201(c) permits a court to take judicial notice, whether it is requested to or not. See U.S. v. Cantu, 12 F.3d 1506, 1509 n.1 (9th Cir. 1993), wherein the Ninth Circuit took judicial notice of the contents of the DSM, citing U.S. v. Johnson, 979 F.2d 396, 401 (6th Cir. 1992).

1    The trial record demonstrates that the trial judge focused on the second prong

2  of the applicable definition of insanity and weighed it carefully:

3         The law requires the Defense to present evidence to support a
          conclusion by a preponderance of the evidence that the defendant
4         either:

5         Number One, did not understand the nature and quality of his act;
          Or, two, that he did not understand at the time that his action of
6         stabbing, that it was wrong.
          ...........................................................................................
7         It was testified and agreed to by all the doctors, and I do find that
          defendant was at the time of the commission of the killing
8         suffering from a mental disorder, namely a methamphetamine
          induced psychotic delusional disorder.
9
          In addressing the first prong of the test, that also is fairly straight
10        forward in that it was not greatly contested.  And it seems clear in
          my view from the evidence Mr. Guzman at the time he stabbed his
11        wife, he did understand the nature and the quality of his actions at
          the time which was supported by his conduct, statements, and
12        conclusions of the doctors.

13        The second prong of the test is a much closer question in my mind.
          And I will state that I have spent a considerable amount of time
14        considering this issue analyzing it both from a legal and factual
          basis.
15
          The question that I must answer is: Did the defendant know or
16        understand at the time of the killing that his conduct was wrong?

17        ...................................................................................................

18        In this case, I understand specifically the Defense argues at the
          time of the killing, the defendant had been suffering a long
19        standing paranoia and beliefs set that led him to fear his wife and
          led [] to fear death at the hands of his wife's hands [sic] and
20        perhaps others.

21        And, further, the stimulus of seeing his wife and the knife agitated
          him to such a state that at the time he stabbed her he believed that
22        it was not morally or legally wrong.  And that this delusional mind
          set caused him not to appreciate or understand the wrongfulness of
23        his conduct.

24        As aside, I wanted to mention that I struggled with the term wrong
          because it's used interchangeably both through the doctors reports
25        and during the testimony.  Because as I believe it is conceded the
          defendant's delusional belief that his wife was out to get him was
26        factually wrong.  In other words, he was incorrect in his

assumption, fear or belief.

Some times the term wrong in my view is used to discuss his incorrect assessment of the scenario and not really to address his appreciation of moral or legal right or wrong. But that's just an aside.

The defendant had for some period of time been suffering from delusions that his wife along with others was involved in a conspiracy to kill him. This is supported by circumstantial evidence. And I do find that to be true at the time of the killing. I do believe he was operating under that belief.

...........................................................................................

The question in this case, and the defendant has presented evidence and asks the Court to find that, at the time of the killing, his delusion created a mental state in which he did not understand or appreciate that it was wrong to kill his wife.

And this refers to the principle that his state of mind was aggravated to such an extent that he believed that he was compelled to act, essentially, in self-defense.

...........................................................................................

In this case, I do find that delusion and observation of the knife triggered a heighten [sic] fear and did cause him to believe that the danger of death or harm to himself was great and significantly more imminent than it had been previously; that his fears had accelerated and he was more concerned than he had previously been. I do find his testimony and his statements on that issue as well as the circumstantial evidence would support that.

The more difficult question and the question I have truly struggled with is: Did he at that moment believe or perceive the threat to be of such imminence that it was not only necessary, but morally and legally right or justifiable for him to act by stabbing his wife as he did in the back.

My answer is no. I do not believe that his mind was so confused or disoriented that he did not realize the wrongfulness of stabbing her. I believe that he sincerely acted in fear. I believe that he acted out of a desire or belief that this would clearly protect him.

What I do not believe is that the evidence, and the evidence does not preponderate, that his state of mind was that he was morally and legally justified to act in self-defense.

...........................................................................

[L]et's assume that his delusional fears were real, and he truly had reason to believe that his wife was in a conspiracy.

Would he still at that moment have the right of self-defense under

20

all the circumstances?  Legally the answer is clearly no.

.....................................................................................................

I believe that I am required to analyze this issue further, however, because I am required to consider what he did believe, or what was his mind capable of appreciating about legal and moral right and wrong.

He exhibited through his statements and in making these findings, I've considered the statements.  And I will agree, the most expansive statements are those given to Doctor Jaffe.  I have also considered his testimony in court on this issue that he understood and perceived that his wife was not actually at the time engaging in any affirmative act to attack him or approach him or confront him in any manner.  No words were spoken.  There was no physical conduct which would indicate that she was in the process of attempting to kill him.

There's - - and I will note this comes from the records and from the observation of Mr. Guzman in court - - but the considerable size difference which I believe he still had the capacity to understand and appreciate that he was in a greater, more powerful physical position than she.

.....................................................................................................

Clearly, there were other options.  And I believe he would have understood that at the time.  Although I do agree and believe that his ability to evaluate was greatly affected, and that his thought process was one that occurred very quickly, and that he has described, as I assume it was true, that he was in a state of panic.

I do find his testimony to be somewhat helpful, although, it was not as detailed on this issue as it might have been.  He stated that he was fearful, and I do find that to be true, and that I believe was very credible.

But when asked to articulate why he stabbed her, he indicated it was panic.  And I do find his testimony regarding her possession of a gun to be interesting, first because, apparently, it was never mentioned in any of the numerous reports and statements that had been previously given.  And it would seem to indicate, and this is not an over-riding factor, but in some small part, the defendant's desire to now enhance the apparent imminence of his wife's threat to him.

I feel this indicates some understanding on his part that he understood on some basic level that she was not in a position to kill him at that point.  And that he is trying to augment or enhance the imminence of the threat.

Also it seems to me from his conduct before, which clearly indicates that he understood the moral right and wrong, the necessary [sic] of his conduct and the conduct of taking the life of another or injuring another from the second after he engaged in stabbing her, he acknowledged that he understood it was wrong and wrong factually; but his statement in conjunction with the 911 tape also supports the conclusion that he understood it was morally wrong.

And this seems to belie or make less credible the argument for such a brief period of time he would not have realized on a fundamental level that he was not justified in stabbing her.

While in conclusion, I feel the defendant was certainly afraid of his wife based on his delusional and paranoid mind set, and he was acting of [sic] a motivation or his reason to stab her was a need to protect himself. I do not believe he perceived that need to be of such dimension that he lost the ability to understand and appreciate right from wrong.

I further find the evidence fails to convince me that his mental state as the result of his delusion was such of [sic] character and quality that he felt compelled by self-defense to kill her; therefore, I find him to be sane at the time of his actions.

RT 219-226.

The fact that petitioner can construct from the evidence alternative scenarios at odds with the court's verdict does not mean that the evidence was insufficient. The trial court's recitation of its findings is based on substantial evidence in the record. This claim should be denied.

Claim 2    Due process violated when the court acted arbitrarily and disregarded established state standards in denying petitioner's motion to dismiss one or more strike convictions

Citing Hicks v. Oklahoma, 447 U.S. 343, 346, 100 S. Ct. 2227 (1980), for the principle that an arbitrary disregard of a state procedure resulting in a deprivation of a liberty interest violates due process under the Fifth and Fourteenth Amendments, petitioner contends that due process implicates the court's refusal to dismiss one or more prior strike convictions despite circumstances placing him clearly outside "the spirit of the Three Strikes statute" as those standards were articulated by the California Supreme Court. Ptn, pp. 15-16, citing People v.

Williams, 17 Cal.4th 148, 161, 69 Cal. Rptr.2d 917 (1998) (to determine whether defendant might be deemed outside the spirit of the Three Strikes law, court must consider the prior serious and/or violent felony convictions "in light of the nature and circumstances of his present felonies...and the particulars of his background, character and prospects.")

In support of this claim, petitioner argues that the two prior convictions occurred 11 years before trial when petitioner was 18; that both priors were the result of a single episode that occurred within a brief span of time; that both prior convictions were brought and tried in the same proceedings; that petitioner had not suffered any other felony conviction since the two strike convictions. Ptn, p. 16. In addition, petitioner maintains that his two misdemeanor convictions (driving under the influence and disturbing the peace) were not indicative of the type of criminal conduct contemplated in Williams, supra, as placing petitioner within the "spirit" of the Three Strikes statutory scheme. Id. Petitioner further asserts that the offense for which he is presently sentenced arose from his "substantial mental illness, and not true criminal intent." Id. Petitioner states that the current offense was "the result of a psychotic delusion" and "not part of a pattern of criminal behavior," that might have been forestalled had petitioner been able to be treated when he sought help hours before killing his wife. Ptn., p. 17.

Respondent argues this is a state law claim not cognizable on federal habeas review. Answer (Ans), p. 23, citing Williams v. Borg, 139 F.3d 737, 740 (9th Cir. 1998) (federal habeas review is limited to constitutional violation, not abuse of discretion). Respondent is correct.

A writ of habeas corpus is available under 28 U.S.C. § 2254(a) only on the basis of some transgression of federal law binding on the state courts. Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985); Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir. 1983). It is unavailable for alleged error in the interpretation or application of state law. Middleton v. Cupp, 768 F.2d at 1085; see also Lincoln v. Sunn, 807 F.2d 805, 814 (9th Cir. 1987); Givens v. Housewright, 786 F.2d 1378, 1381 (9th Cir. 1986). Habeas corpus cannot be utilized to try state

1    issues de novo.  Milton v. Wainwright, 407 U.S. 371, 377, 92 S. Ct. 2174, 2178 (1972).

2         The Supreme Court has reiterated the standards of review for a federal habeas

3    court.  Estelle v. McGuire, 502 U.S. 62, 112 S. Ct. 475 (1991).  In Estelle v. McGuire, the

4    Supreme Court reversed the decision of the Court of Appeals for the Ninth Circuit, which had

5    granted federal habeas relief.  The Court held that the Ninth Circuit erred in concluding that the

6    evidence was incorrectly admitted under state law since, "it is not the province of a federal

7    habeas court to reexamine state court determinations on state law questions."  Id. at 67-68, 112 S.

8    Ct. at 480.  The Court re-emphasized that "federal habeas corpus relief does not lie for error in

9    state law."  Id. at 67, 112 S. Ct. at 480, citing Lewis v. Jeffers, 497 U.S. 764, 110 S. Ct. 3092,

10   3102 (1990), and Pulley v. Harris, 465 U.S. 37, 41, 104 S. Ct. 871, 874-75 (1984) (federal courts

11   may not grant habeas relief where the sole ground presented involves a perceived error of state

12   law, unless said error is so egregious as to amount to a violation of the Due Process or Equal

13   Protection clauses of the Fourteenth Amendment).

14        The Supreme Court further noted that the standard of review for a federal habeas

15   court "is limited to deciding whether a conviction violated the Constitution, laws, or treaties of

16   the United States (citations omitted)."  Id. at 68, 112 S. Ct. at 480.  The Court also stated that in

17   order for error in the state trial proceedings to reach the level of a due process violation, the error

18   had to be one involving "fundamental fairness," Id. at 73, 112 S. Ct. at 482, and that "we 'have

19   defined the category of infractions that violate "fundamental fairness" very narrowly.'"  Id. at 73,

20   112 S. Ct. at 482.  Generally, a claim that petitioner did not receive the proper state law sentence

21   from a state court judge is not cognizable on federal habeas review, Miller v. Vasquez, 868 F.2d

22   1116, 1118-1119) (9th Cir.1989)

23        While the total or effective absence (arbitrary application) of an important

24   procedure guaranteed by state law might well be deemed violation of a liberty interest, see Hicks,

25   supra, (taking sentencing discretion away from the jury despite state law mandating that the jury

26   decide the sentence), simply claiming that the trial court exercised its discretion poorly, is not

24

1  sufficient, even if true, to raise a federal issue.

2          In any event, even if this court were entitled to review the "striking" issue in this

3  federal proceeding as one cognizable in federal habeas corpus proceedings, the trial court did not

4  abuse its discretion under state standards. Id.

5          The state court of appeal addressed the claim, as follows:

6          Defendant contends the trial court's denial of his motion to strike a
           prior serious felony conviction was an abuse of discretion.
7          Specifically, he relies upon the fact that both strike convictions
           arose from one judicial proceeding in 1989. Defendant also argues
8          that his intervening criminal record was for misdemeanors, and that
           his current offense was the product of his psychotic delusion.

9
           Appellate court review of a trial court's decision to deny a *Romero*
10         motion is not de novo. " '[T]he superior court's order [i]s subject to
           review for abuse of discretion. This standard is deferential.
11         [Citations.] But it is not empty. Although variously phrased in
           various decisions [citation], it asks in substance whether the ruling
12         in question " *falls outside the bounds of reason* " under the
           applicable law and the relevant facts [citations].' " ( *People v.*
13         *Garcia* (1999) 20 Cal.4th 490, 503, 85 Cal.Rptr.2d 280, 976 P.2d
           831, quoting *People v. Williams* (1998) 17 Cal.4th 148, 162, 69
14         Cal.Rptr.2d 917, 948 P.2d 429.)

15         The question is whether "in light of the nature and circumstances
           of his present felonies and prior serious and/or violent felony
16         convictions, and the particulars of his background, character, and
           prospects, the defendant *may be deemed outside the schemes spirit,*
17         *in whole or in part, and hence should be treated as though he had*
           *not previously been convicted of one or more serious and/or*
18         *violent felonies.*" ( *People v. Williams*, *supra*, 17 Cal.4th at p. 161,
           69 Cal.Rptr.2d 917, 948 P.2d 429, italics added; *People v. Garcia*,
19         *supra*, 20 Cal.4th at p. 503, 85 Cal.Rptr.2d 280, 976 P.2d 831.)

20         As we recently explained in *People v. Strong* (2001) 87
           Cal.App.4th 328, 104 Cal.Rptr.2d 490, the striking of a prior
21         serious felony conviction is not a routine exercise of sentencing
           discretion. It is an extraordinary exercise of discretion to determine
22         that a defendant who falls within the letter of the three strikes law
           should be treated as if he or she has no prior convictions because,
23         for certain reasons, he or she is deemed to be outside the spirit of
           the law. (87 Cal.App.4th at pp. 337-338, 104 Cal.Rptr.2d 490.)

24
           *7 We hold the trial court properly exercised its discretion. The
25         current offense is a homicide. If defendant had not suffered from a
           mental disorder, he might well have been convicted of first or
26         second degree murder, rather than offered a plea bargain to

                                                    25

voluntary manslaughter. Moreover, although both prior convictions were in one proceeding, one was a violent robbery in which defendant fired a shot. The other conviction involved a threat with a gun on a uniformed police officer.

Defendant argues that his 1989 prior convictions should be disregarded due to the passage of time. Even the presence of a statutory "washout" period as urged by defendant to purge the effect of the prior convictions would not have worked in defendant's favor. Despite his argument on appeal that he did not demonstrate a criminal lifestyle, he admittedly was a drug dealer and heavy drug user since his parole on the prior convictions. His contacts with the criminal justice system were repeated and significant. His character and prospects did not demonstrate a change of lifestyle. Based upon the gravity of the current offense and his past conduct, we conclude that it would have been an abuse of discretion for the trial court to find defendant outside the spirit of the three strikes law.

People v. Guzman, 2002 WL 1801768 *6-7.

In this instance, petitioner does not point to anywhere in the record of this case which provides evidence that the state court exhibited an arbitrary disregard for established state standards in denying petitioner's motion to dismiss one or more the priors as strikes. The record demonstrates that the two priors, although arising from the same incident were not simultaneous and were separated by a span of time, with the initial strike involving petitioner's having fired at an individual from whom he and an accomplice were stealing a truck. RT 253, CT 49. Nor were the intervening years free of criminal behavior. RT 254-256, CT 50-57, 65-66. The record shows that the trial judge provided coherent reasoning as the basis for rejecting the motion to dismiss one or both priors as strikes; further, it is clear that the trial judge considered petitioner's mental illness a circumstance in mitigation. RT 263-271. Moreover, the fact that the trial court (erroneously) did not "pile on" this already substantial sentence with an additional five year recidivism enhancement for a prior brandishing a firearm at a peace officer, see discussion below, does not mean that the trial court was arbitrarily inconsistent in not striking this prior at the Romero stage. The record simply bespeaks the trial court's determination that justice was done with the 31-life sentence.

1    For reasons set forth by the state court of appeal, the court finds this claim was

2  neither an abuse of discretion or an unreasonable application of clearly established Supreme

3  Court authority.  This claim should be denied.

4  Claim 3          State and federal rights to due process were violated when the
                    court imposed a 31-year-to-life sentence
5

6          Petitioner insists that he would not have entered a no contest

7  plea to voluntary manslaughter or admitted personal use of a knife had he known that the

8  maximum sentence he faced was 31 years to life, rather than the 25-year-to-life maximum about

9  which the trial judge mistakenly informed him, should the charge and all prior conviction

10  enhancements be proved true; thus, his plea was not knowingly, intelligently, or voluntarily

11  entered.  Ptn, pp. 17-19; Traverse, pp. 8-10.[13]  In support of this claim, petitioner points out that

12  when he entered his plea at a hearing on October 18, 2000,[14] the trial court advised him that his

13  maximum sentence could be twenty-five years to life.  CT 21, 35; RT 13-14.  Yet, on December

14  8, 2000, petitioner was sentenced to thirty-one years to life, calculated as: twenty-five years to

15  life for the voluntary manslaughter conviction (Cal. Penal Code § 192(a)), with one year

16  consecutive for the use of a deadly weapon enhancement (Cal. Penal Code § 12022(b)(1)); an

17  added five consecutive years for the first prior conviction alleged (Cal. Penal Code § 667(a)),

18  with credit for 572 days of presentence custody.  Ptn, p. 18, citing RT 266, 268, 271; see also CT

19  69-70.

20          Respondent notes that the portion of this claim challenging the voluntariness of

21  the plea was silently denied on the merits in a state habeas petition.  Ans, p. 24, Lodged Docs 22,

22  petition filed on January 4, 2005, and 23, Order, filed on November 16, 2006.  Therefore,

23  although petitioner does not note it, as there is no reasoned state court opinion to this portion of

24

25          [13] The court's electronic pagination is referenced.

26          [14] Petitioner mistakenly dates this hearing as having occurred in 1999, rather than 2000.

27

the claim, this federal court will independently review the record in adjudication of that issue to determine whether the silent denial "is objectively unreasonable." Himes v. Thompson, 336 F.3d at 853.[15]

Respondent contends that what the trial court told petitioner was that should he enter a guilty plea and the prior convictions later be found true, he could face a "minimum sentence of twenty-five years to life." Ans, p. 26. Interestingly, respondent cites the same part of the record, RT 13-14, in support of his own position.

In informing petitioner of the sentence to which he might ultimately be subject, the record shows the judge told him that if his two prior strike sentences were proved true he might serve "a mandatory sentence is 25 years to life." RT 13. The judge also stated: "I want to make sure you understand the possible range of consequences, some sense of the harshest consequence. And that is, that you do face 25 years to life if you enter this plea and your prior convictions are found to be true." RT 13-14. The judge then informed petitioner that he was subject to a 12 year term by entering his plea, indicating that would constitute imposition of the eleven years at the high end of the involuntary manslaughter plea and one year for the weapon enhancement. RT 14. The trial court also states that: "If you are found to be sane, you could be sentenced anywhere up to the maximum that I have just described. I've also described what could happen if your prior convictions are found to be true." RT 14. It appears as if the trial court required petitioner to "add up" the 25-life sentence and the determinate terms to arrive at the precise maximum possible sentence. Strictly speaking, petitioner is correct that the record shows the trial judge did not make clear to petitioner at his plea colloquy that he could be subject to any sentence beyond 25-to-life, should the maximum potential sentence ultimately be imposed.

---

[15] This issue becomes somewhat confused by the fact that an earlier state supreme court habeas petition, filed on June 23, 2003, was denied on March 5, 2004, with a citation to In re: Clark, 5 Cal. 4 th 750 (1993). Respondent Lodged Docs 20 and 21.

1    A guilty plea must be knowing, intelligent and voluntary.  <u>Brady v. United States</u>,

2    397 U.S. 742, 748, 90 S. Ct. 1463, 1468-1469 (1970); <u>Boykin v. Alabama</u>, 395 U.S. 238, 242, 89

3    S. Ct. 1709, 1711 (1969).  Knowledge of the maximum potential penalty is a required part of a

4    knowing and voluntary plea.  <u>See</u> <u>Steinsvick v. Vinzant</u>, 640 F.2d 949 (9th Cir. 1981); <u>Pebworth</u>

5    <u>v. Conte</u>, 489 F.2d 266, 267 (9th Cir. 1974).  However, "the voluntariness of [a petitioner's]

6    guilty plea can be determined only by considering all of the relevant circumstances surrounding

7    it."  <u>Brady</u>, at 749, 90 S. Ct. at 1469, and a defendant must be in fact prejudiced by erroneous

8    information.  <u>See</u> <u>United States v. Dominguez-Benitez</u>, 542 U.S. 74, 124 S.Ct. 2333 (2004)

9    (guilty plea colloquy defects are not structural error) and <u>Brecht v. Abrahamson</u>,  507 U.S. 619,

10   637, 113 S.Ct. 1710 (1993)  (error must have had a substantial and injurious outcome on the

11   proceedings (here, whether petitioner would have pled guilty but for the error)); <u>United States v.</u>

12   <u>Flynn</u>, 2009 WL 586126 (9th Cir. 2009) (applying <u>Brecht</u> in a federal habeas plea colloquy error

13   situation).

14            The following excerpt of the trial record includes the colloquy that took place

15   between the court and the petitioner at the time he entered his plea.

16            THE COURT:  The defendant has previously entered pleas of not
         guilty and not guilty by reason of insanity in this case, and on
17       Monday we had briefly convened to address some preliminary
         matters.
18
         And at that time, Mr. Guzman waived his right to a trial by jury
19       and agreed that this case would be tried to the Court on all issues.

20       It's my understanding it was anticipated, correct me if I'm wrong,
         Mr. Carlson, that Mr. Guzman would be, however, entering a plea
21       of not guilty to voluntary manslaughter in this case and desires
         thereafter to proceed to trial on the sanity issue before the Court.
22       Is that correct?

23       MR. CARLSON:  That's correct, your Honor.

24       THE COURT:  And can you state the terms and understanding
         regarding the plea.
25
         MR. CARLSON:  Mr. Guzman will plead guilty to the lesser
26       offense of voluntary manslaughter.  He will admit the use of the

1  knife in the incident.

2  The district attorney and I have agreed that we would leave open
   the potential litigation on the priors and, obviously, the sanity
3  phase, which was stated.

4  THE COURT:  So at this time, he will not be admitting the truth of
   the prior convictions but will be pleading to the lesser related
5  offense that you stated on the charge and defer the issue of the
   proof of priors until the issue of sanity has been concluded?

6
   MR. CARLSON:  Correct, your Honor.
7
   THE COURT:  That is the recommendation of the people?
8
   MS. EARL:  It is, Judge.
9
   THE COURT:  Is this what you're prepared to do, Mr. Guzman?
10
   THE DEFENDANT:  Yes.
11
   THE COURT:  Do you understand what your attorney has stated?
12
   THE DEFENDANT:  Yes.
13
   THE COURT:  Miss Earl, if you could state the reason for the
14 recommendation.                    ****

15
   Provisions for voluntary manslaughter or manslaughter are set
16 forth in 192 of the Penal Code, and Subsection A is voluntary
   manslaughter.
17
   MS. EARL:  Yes.
18
   THE COURT:  So it would be 192, Subsection A, the punishment
19 for manslaughter, involuntary manslaughter, as is set forth in Penal
   Code section 183 [sic].
20
   Mr. Carlson, do you have any amendment or further statement in
21 regards to the factual basis set forth by the people at this time?

22 MR. CARLSON:  No, your Honor.

23 THE COURT:  Counsel, have you discussed with Mr. Guzman the
   elements of the crime charged and the defenses he may have?
24
   MR. CARLSON:  I have.
25
   THE COURT:  Have you explained to him the nature of the lesser-
26 related crime of voluntary manslaughter?

30

1    MR. CARLSON:  I have.

2    THE COURT:  Have you explained his rights and the
     consequences of entering this plea?
3
     MR. CARLSON:  I have.
4
     THE COURT:  Are you satisfied that he understands that
5    information?

6    MR. CARLSON:  I am.

7    THE COURT:  Mr. Guzman, do you understand those things?

8    THE DEFENDANT:  Yes.

9    THE COURT:  Specifically, do you understand the nature of the
     crime with which you are charged, that is, murder and the use of a
10   deadly weapon and the defenses you may have to that crime?

11   THE DEFENDANT:  Uh-huh (affirmative), yes.

12   THE COURT:  Do you also understand the nature of the crime, the
     lesser offense to which you will be entering a plea, the crime of
13   voluntary manslaughter?

14   THE DEFENDANT:  I think so.

15   THE COURT:  And if you want further time to talk with your
     attorney, I'd be happy to allow that.
16
     Do you feel that you understand the nature of the crime of
17   voluntary manslaughter?

18   THE DEFENDANT:  Um, we've talked about it.

19   THE COURT:  Do you understand it, sir?

20   THE DEFENDANT:  Um, I think so.

21   THE COURT:  Do you understand your constitutional rights?

22   THE DEFENDANT:  Yes.

23   THE COURT:  All right.  And your attorney has discussed the
     consequences?  That's what may happen to you if you enter this
24   plea.

25   THE DEFENDANT:  Um, yes.

26   THE COURT:  And I'm going to discuss those consequences with

                                    31

you further on the record, just to be clear. I want to make sure before this appearance today that you have had that discussion and you understand what you're doing.

This is a serious and considered a violent felony, and it would be a strike on your record. That is one of the consequences. Do you understand that?

THE DEFENDANT: Yes.

THE COURT: Counsel, you have specifically addressed that issue with your client?

MR. CARLSON: I have.

THE COURT: In particular, I'll note the two prior strike convictions are also alleged against Mr. Guzman.

If you entered this plea and the Court finds those prior convictions to be true, a mandatory sentence is 25 years to life.

Do you understand that Mr. Guzman?

THE DEFENDANT: Yes.

MR. CARLSON: Your Honor, I have explained to Mr. Guzman that that is the potential sentence; however, the Court does have the power to strike the strike.

There's no guarantees that that would occur; but in the event that he were found sane, we would address those issues at that time and he's aware of the consequences.

THE COURT: All right. And that is true, Mr. Guzman, that your attorney can request that I consider striking one or both of the prior convictions.
But that is not a promise, and that is an issue that we have not yet addressed, we would address in the future.
I want to make sure you understand the possible range of consequences, some sense of the harshest consequence. And that is, that you do face 25 years to life if you enter this plea and your prior convictions are found to be true.
Do you understand that?

The Defendant: Yes.

THE COURT: Now, the potential prison sentence for this offense is three, six or eight years in state prison plus –

MR. CARLSON: Excuse me, your Honor, that's three, six or eleven.

THE COURT:  Eleven, thank you, plus one additional year, as I understand, for the enhancing allegation.

So the offense to which you're pleading at this time subjects you to 12 years in state prison.  Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  This issue of your sanity will be tried before myself, that trial to begin shortly.

If you are found to be sane, you could be sentenced anywhere up to the maximum that I've described.  I've also described what could happen if your prior convictions are found to be true.

I also want you to understand that if you're found to be not sane or insane at the time of the commission, as a result of that finding, the Court could order you committed to a mental hospital or a treatment facility as deemed appropriate by the Court and that potentially those – that commitment, if extended, could be for a period of life.
Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  If you are committed to state prison subsequent to this conviction, you could be subject to parole supervision for seven years or life, depending on the term which you receive for this offense.  Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  You could be ordered to pay a fine of up to 10,000 dollars.  And the law requires what is called a restitution fine.  And it requires a minimum fine of 200 dollars and a maximum fine of 10,000 dollars.  Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  The law requires that you make payment of restitution to the victim for any actual loss suffered by the victim.  The Court would order that as a result of the conviction.

Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  If you're not a citizen of the United States, this plea could result in your being deported, excluded from admission or denied naturalization as a citizen.

| | |
|---|---|
| 1 | Do you understand? |
| 2 | THE DEFENDANT:  Yes. |
| 3 | THE COURT:  And if you're on probation or parole for any other |
| | criminal offense, it could be violated or revoked and you could |
| 4 | receive the maximum penalty on this case. |
| 5 | Do you understand? |
| 6 | THE DEFENDANT:  Yes. |
| 7 | THE COURT:  Are there any other consequences that the people |
| | believe Mr. Guzman should be advised of at this time? |
| 8 | |
| | MS. EARL:  No. |
| 9 | |
| | THE COURT:  And Mr. Carlson? |
| 10 | |
| | MR. CARLSON:  No, your Honor. |
| 11 | |
| 12 | **** |
| 13 | RT 8-20 (parts pertinent to background and punishment only). |

Petitioner is correct that he was never apprised of the "maximum minimum" because the trial judge informed him that his exposure was, at most, 25-to-life, rather than the 31 years to life that he eventually received.   Therefore, it is arguable, on the face of it, that the six-year difference at the low end of the sentence of the maximum sentence of which petitioner was informed before entering his plea implicates due process.  However, in California law, the mere possibility of parole does not transmute a life sentence into something less than a life sentence.

> As we indicated in <u>Wingo</u>, <u>supra</u>, 14 Cal.3d 169, 121 Cal.Rptr. 97, 534 P.2d 1001, "traditionally '[o]ne who is legally convicted has no vested right to the determination of his sentence at less than maximum' [citation]. Moreover, 'a defendant under an indeterminate sentence has no "vested right" to have his sentence fixed at the term first prescribed by the [parole authority] "or any other period less than the maximum sentence provided by statute." ' [Citations.] 'It has uniformly been held that the indeterminate sentence is in legal effect a sentence for the maximum term' [citation], subject only to the ameliorative power of the [parole authority] to set a lesser term. [Citations.]" ( <u>Id</u>. at p. 182, 121 Cal.Rptr. 97, 534 P.2d 1001.) Indeed, "'[i]t is fundamental to [an] indeterminate sentence law that every such sentence is for the

1  [statutory] maximum unless the [parole] [a]uthority acts to fix a
   shorter term.'"

2

3  In re Dannenberg, 34 Cal. 4th 1061, 1097-98, 23 Cal. Rptr.3d 417 (2006).

4        Thus, the statutory maximum to which petitioner was subject at

5  sentencing was the same as that about which he had been informed at the time of entering his

6  plea – life in prison.  Further, petitioner's argument that he would not have pled if he understood

7  his exposure to top out at 31-years-to-life vs. 25-years-to-life is not particularly persuasive.  As

8  noted, the maximum potential exposure about which petitioner, before entering his plea, was

9  informed was a life sentence.  The misinformation went only to the dates on which petitioner

10 would *possibly* be eligible for parole.  Further, as respondent notes neither petitioner nor his

11 counsel objected at the time the sentence was imposed.  RT 268-271.  After a review of the

12 record in this case, the undersigned concludes that petitioner's plea of no contest to voluntary

13 manslaughter and admission as to the weapon enhancement – essentially a plea of not guilty by

14 reason of insanity where the matter proceeded to a bench trial to determine petitioner's sanity at

15 the time of the offense – was voluntarily made, with knowledge of the consequences thereof.  In

16 the alternative, the mistake about the date on which he might first *possibly* be eligible for parole

17 status was not sufficiently prejudicial that the guilty plea would have been withdrawn.  This

18 claim should be denied.

19        Petitioner further asserts that his due process rights were violated by the trial

20 court when sentencing petitioner "under a mistaken understanding of its legal options."  Ptn, at

21 19-20.  Germane to this claim is the fact that when the trial judge mistakenly struck the five-year

22 enhancement for the second prior conviction under § 667(a)[16] in the interest of justice, the court

23

24     [16] Cal. Penal Code 667(a) states: "[i]n compliance with subdivision (b) of Section 1385,
   any person convicted of a serious felony who previously has been convicted of a serious felony in
   this state or of any offense committed in another jurisdiction which includes all of the elements
25 of any serious felony, shall receive, in addition to the sentence imposed by the court for the
   present offense, a five-year enhancement for each such prior conviction on charges *brought and*
26 *tried separately*. The terms of the present offense and each enhancement shall run

                                        35

could not have imposed the additional five years because petitioner could not have been sentenced on it because the second offense was not brought and tried separately. Ptn, p. 18 & n. 1. This portion of the claim was fully addressed on direct appeal in the state court appellate opinion:

> Defendant's sentence of 31 years to life as imposed, does not reflect a five-year term for the second prior serious felony conviction of brandishing a firearm at a police officer. (§ 667, subd. (a).) The trial court announced it would not impose five more years on that prior conviction, although it did not strike the prior for purposes of avoiding a three strikes sentence. Although the trial court did not have discretion to fail to impose punishment under section 667, subdivision (a), the sentence remains the same because the enhancement was barred on other grounds, as both parties agree.
>
> When a prior conviction has been found true under section 667, subdivision (a), imposition of the five-year enhancement is mandatory. ( *People v. Dotson* (1997) 16 Cal.4th 547, 553, 66 Cal.Rptr.2d 423, 941 P.2d 56.) However, imposition of more than one five-year enhancement is prohibited when the prior convictions were not brought and tried separately. ( *People v. Fuhrman* (1997) 16 Cal.4th 930, 939, 67 Cal.Rptr.2d 1, 941 P.2d 1189.)
>
> Both parties agree defendant could not be sentenced to more than 31 years to life. The People concede that the prior convictions were brought and tried in the same case, and could not support a separate five-year term. Defendant concedes the court had no power to strike a section 667, subdivision (a) prior. We accept the concessions and find the result to be correct, even if the court's legal reasoning was incorrect.
>
> *6 [3] The parties disagree about whether remand is required, although the sentence itself is correct. Defendant argues that the trial court attempted to exercise leniency and mitigate the sentence, and should now have another opportunity to consider defendant's *Romero* motion in light of his real legal status.
>
> Defendant principally relies upon *People v. Stofle* (1996) 45 Cal.App.4th 417, 52 Cal.Rptr.2d 829. In that case, the appellate court remanded the case for reconsideration of whether to strike a "strike" because it had determined that defendant would be given five additional years for a serious felony. Reconsideration was required because defendant's sentence would be longer than the trial court had in mind. ( *Id.* at p. 422, 52 Cal.Rptr.2d 829.)

consecutively." [Emphasis added.]

36

> Similarly, in *In re Huddleston* (1969) 71 Cal.2d 1031, 80 Cal.Rptr. 595, 458 P.2d 507, remand was required because an invalid prior rendered defendant newly eligible for probation.
>
> Such is not the case here. The sentencing options are now as they were at the initial sentencing. Defendant's sentence remains at 31 years to life. Defendant's hope for an act of leniency by the trial court ignores the legal standard that a strike may not be stricken as an act of leniency, but only if the court finds a defendant "outside the spirit" of the three strikes law. Inasmuch as we conclude below that the trial court's finding that defendant was not outside the spirit of the three strikes law is correct, remand is not required.

People v Guzman, supra, at *5-6.

Respondent points out that petitioner attempts to "federalize" the state sentencing law error made by the trial judge, relying on Hicks, supra. Ans, p. 26. Respondent is correct that where, as here, a state permits state appellate courts to address the question of trial court error and thereby cure the deprivation of a state-created liberty interest leaves this court with "no basis for disputing this interpretation of state law...." Clemons v. Mississippi, 494 U.S. 738, 747, 110 S. Ct. 1441, 1447 (1990). Plainly, the state appellate court's resolution of the alleged due process violation was not an unreasonable application of clearly established Supreme Court authority.

Claim 4        Trial court judge not impartial (Abandoned)

Claim 5        Ineffective assistance of trial counsel

In support of this claim, petitioner contends that had he known the maximum sentence that he faced, he would not have pled no contest to voluntary manslaughter by personal use of a knife, but instead did so in reliance on the advice of his court-appointed counsel. Ptn, pp. 20-21. Further, petitioner avers that had counsel been competent, he would have investigated the maximum sentence petitioner faced and advised him accordingly. Ptn, p. 21. Finally, petitioner contends that he has been diligent in pursuing potential claims and that it is his trial and appellate attorneys' failure to recognize, address and correct the sentencing error which constitutes external causes for failing to raise this issue in a prior petition and that petitioner has been prejudiced by these errors by being sentenced to six more years than the trial court informed

1  petitioner that he would receive.  Id.

2        Although generally conceding state court exhaustion as to the four claims raised

3  herein, respondent, in addition to contending nevertheless that the portion of claim 1 claiming

4  that California's definition of insanity violates due process is not exhausted (previously

5  addressed), also asserts the same as to the portion of this claim that implicates counsel's

6  ineffectiveness for failing to advise petitioner of the maximum penalty, again noting that this

7  court is authorized to deny unexhausted claims on the merits.  Answer, p. 9 & n. 3, citing 28

8  U.S.C. § 2254(b), & p. 21 & n. 10.[17]

9        The test for demonstrating ineffective assistance of counsel is set

10  forth in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984).  First, a petitioner must

11  show that, considering all the circumstances, counsel's performance fell below an objective

12  standard of reasonableness.  Strickland, 466 U.S. at 688, 104 S. Ct. at 2065.  To this end, the

13  petitioner must identify the acts or omissions that are alleged not to have been the result of

14  reasonable professional judgment.  Id. at 690, 104 S. Ct. at 2066.  The federal court must then

15  determine whether in light of all the circumstances, the identified acts or omissions were outside

16  the wide range of professional competent assistance.  Id., 104 S. Ct. at 2066.  "We strongly

17  presume that counsel's conduct was within the wide range of reasonable assistance, and that he

18  exercised acceptable professional judgment in all significant decisions made."  Hughes v. Borg,

19  898 F.2d 695, 702 (9th Cir. 1990) (citing Strickland at 466 U.S. at 689, 104 S. Ct. at 2065).

20        Second, a petitioner must affirmatively prove prejudice.  Strickland, 466 U.S. at

21  693, 104 S. Ct. at 2067.  Prejudice is found where "there is a reasonable probability that, but for

22  counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at

23  694, 104 S. Ct. at 2068.  A reasonable probability is "a probability sufficient to undermine

24  confidence in the outcome."  Id., 104 S. Ct. at 2068.

25  ────────────

26  [17] Respondent points to Lodged Doc 22, wherein the ineffectiveness claim relates to the
    failure to object to the sentence.  This petition was filed by petitioner's current counsel.

In extraordinary cases, ineffective assistance of counsel claims are evaluated based on a fundamental fairness standard. Williams v. Taylor , 529 U.S. 362, 391-93, 120 S. Ct. 1495, 1512-13 (2000), (citing Lockhart v. Fretwell, 113 S. Ct. 838, 506 U.S. 364 (1993)).

To the extent that petitioner contends that he obtained ineffective assistance of counsel by his trial counsel's failure to investigate the sentence to which he might be subject, this portion of the claim, in addition to being unexhausted, lacks merit. The court has previously determined that petitioner was not deprived of due process in the trial court's having described the potential sentence as 25-years-to-life rather than the 31-year-to-life sentence imposed. As such, even assuming petitioner could have demonstrated thereby that his counsel's conduct in failing to have determined and informed petitioner of the six-year difference on the term of years part of the sentence, petitioner cannot show the requisite prejudice he would have to demonstrate in the second prong of an ineffective assistance of counsel claim. A defendant who seeks to show prejudice by challenging the validity of a guilty plea on the ground of ineffective assistance of counsel "must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." Hill v. Lockhart, 474 U.S. 52, 58-59, 106 S. Ct. 366, 370 (1985). Although petitioner's counsel insists that petitioner would not have pled guilty had he known the full sentence to which he might be subject (ptn, p. 20, traverse, p. 10), counsel presents nothing other than a conclusory statement for such a premise and fails to explain how, when petitioner was informed that he was subject to a life sentence under either sentence formulation, he was sufficiently prejudiced by counsel's alleged non-performance. Moreover, as petitioner appears to implicitly concede in the traverse (p. 8), the failure of counsel to inform petitioner of the precise sentence to which he might be subject on pleading guilty "does not rise to the level of a gross mischaracterization of the likely outcome of his case, and thus does not constitute ineffective assistance of counsel." Doganiere v. U.S., 914 F.2d 165, 168 (9th Cir. 1990) (where defendant was informed that he would receive a twelve-year sentence, but sentence imposed was fifteen years with a twenty-year term of probation). This

1  portion of his ineffectiveness claim should be denied on that basis.

2         As to the claim that failure to object at the point of sentencing, or to have

3  appealed the imposition of sentence in excess of which petitioner was previously informed,

4  petitioner posits no case authority in either the petition or the traverse in support of this

5  proposition.  As respondent observes, there does not appear to have been a significant basis to

6  object.  This claim should be denied.

7         Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for

8  a writ of habeas corpus be denied.

9         These findings and recommendations are submitted to the United States District

10  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

11  days after being served with these findings and recommendations, any party may file written

12  objections with the court and serve a copy on all parties.  Such a document should be captioned

13  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the

14  objeRTions shall be served and filed within ten days after service of the objections.  The parties

15  are advised that failure to file objections within the specified time may waive the right to appeal

16  the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

17  DATED: March 31, 2009                                    /s/ Gregory G. Hollows
                                                            _____
18                                                           GREGORY G. HOLLOWS
                                                            UNITED STATES MAGISTRATE JUDGE
19  GGH:009
    guzm0700.hab
20

21

22

23

24

25

26